**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Lamisa Parkar, | ) |
| | ) |
| Plaintiff, | ) Civil Action No.: |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| Oracle America, Inc., | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR VIOLATIONS OF TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964**

**Case Summary**: Sex discrimination, retaliation and constructive discharge: A tech company with a budding life sciences business aggressively recruits from a biotech company a highly credentialed female executive who had significant equity in the biotech company. The tech company agreed to match her equity. After the female executive joined the tech company, a male Senior Vice President maneuvered to gain control of the tech company's life sciences business, then took the responsibilities from the female executive and distributed them mostly to men. When the female executive reported to HR that the male Senior Vice President had discriminated against her on the basis of sex, the company retaliated against her causing her to lose her company equity.

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under federal law, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2.    Venue is proper in the Northern District of Georgia, Atlanta Division, pursuant to 42 U.S.C. § 2000e-5(f)(3) because Dr. Parkar worked within this District.

3.    Dr. Parkar has satisfied all conditions precedent to filing this action.

**PARTIES**

4.    Plaintiff Dr. Lamisa Parkar is an individual and resident of Marietta, Georgia. She was employed by Oracle America, Inc. as Group Vice President, Strategy and Research Services in Oracle's Health and Life Sciences division from November 1, 2023 through June 30, 2025.

5.    Defendant Oracle America, Inc. is a technology corporation with a principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065, and employs more than 65,000 individuals worldwide. Oracle America, Inc. is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

**FACTUAL ALLEGATIONS**

**A. Oracle's Recruitment of Dr. Parkar and the Promises That Induced Her to Join**

6.    Dr. Lamisa Parkar holds a Doctor of Medicine degree and a Master of Business Administration and built her career in healthcare strategy, technology, and life sciences, including senior executive roles at McKesson Corporation and Mirati Therapeutics, Inc. At Mirati, she served as Vice President with responsibility for

2

real-world evidence and digital engagement, and she held a substantial equity package in connection with that position.

7.    In 2023, Oracle's leadership recruited Dr. Parkar to leave Mirati and lead strategic and commercial development for Oracle's Life Sciences business. Oracle publicly featured Dr. Parkar as the executive responsible for driving Oracle's Life Sciences business strategy across clinical trials, safety solutions, real world evidence, and analytics products.

8.    On September 19, 2023, Oracle extended to Dr. Parkar a written offer of employment for the position of Group Vice President, Strategy and Research Services, Health and Government Industry Unit, reporting to Seema Verma, Executive Vice President and General Manager of Oracle Health and Life Sciences. Dr. Parkar accepted on September 20, 2023 and commenced employment on November 1, 2023.

9.    Oracle's offer provided, in addition to a signing bonus and her salary, approval for a restricted stock unit ("RSU") grant valued at $1,600,000, calculated as $1,600,000 divided by the closing sale price of Oracle Corporation common stock on the grant date, which equated to approximately 14,809 shares.

10.    The RSU grant was structured to replace equity Dr. Parkar was forfeiting by leaving Mirati. The sign-on bonus was subject to a clawback provision. If Dr. Parkar voluntarily resigned or was terminated for any reason other than a position

3

elimination or reduction in force within eighteen months of each installment; she was required to immediately return that installment to Oracle. This compensation structure made voluntary departure financially prohibitive during the early years of her employment.

11.     In reliance on Oracle's representations of meaningful strategic leadership and on the compensation package designed to replace the equity she was forfeiting at Mirati, Dr. Parkar joined Oracle.

### B. Phase 1: Exclusion Begins While Dr. Parkar Reports to Seema Verma

12.      Beginning in November 2024, Nino Bice began maneuveringto take control of Oracle's Life Sciences business while

13.     Dr. Parkar remained a member of Seema Verma's organization.

14.     During this period, Bice restricted Dr. Parkar's ability to perform her role. A female employee, who at that time worked within Bice's organization, informed Dr. Parkar that Bice had forbidden her and her team from working with Dr. Parkar or sharing information with her without Bice's presence. Bice later imposed the same restriction on Seema Verma's team after Dr. Parkar transferred to his organization.

4

15.    On February 11, 2025, while Dr. Parkar retained responsibility for pricing strategy for the OPR product, Bice distributed an email to a group of Oracle employees directing that "Charles and Jamuna will own the pricing and packaging for OPR and will come with a new proposal on price model and price points." The pricing work that Dr. Parkar and her team had been performing was transferred to others, without her input or consent and without any stated business rationale.

16.    During this same period, Bice recruited Dr. Parkar to transfer from Seema Verma's organization into his own, representing that she would have full strategic oversight over Oracle's Life Sciences business. In December 2024 text messages, Bice assured Dr. Parkar that she would own clinical applications, commercial activities, and provider workflows, told her she was "going to be fine," and indicated that other product leaders joining his team would eventually report to her.

### C. Phase 2: Transfer to Bice and Escalating Discrimination February–May 2025

17.    On February 24, 2025, Dr. Parkar officially transferred from Seema Verma's reporting line to Nino Bice's organization, assuming the title of VP of Product Development. At the time of her transfer, Bice had also hired two additional VP-level product leaders: Neil Abraham (male) and Sowmya Ballakur (female).

5

18. On February 27, 2025, consistent with the scope Bice had represented, he formally assigned Life Sciences analytics responsibility to Dr. Parkar in writing, directing: "Lamisa will take over the Analytics for LS (for Academics, Research and Pharma/CRO customer segments) as PM leader. Her and her team will own the pricing doc, GTM, and iTeam process."

19. That scope was not maintained. Within weeks of the February 27 assignment, Bice began systematically withdrawing Dr. Parkar's responsibilities and reassigning them to others, predominantly to male colleagues.

20. At approximately the time of Dr. Parkar's transfer, Bice transitioned provider workflows for clinical trials from Dr. Parkar to Graham Bury (male) during a live conversation in mid-February 2025, without advance notice and without any articulated business justification.

21. On April 3, 2025, Bice excluded Dr. Parkar from an engineering review meeting for the Life Sciences analytics platform. He communicated the exclusion by Slack message, stating: "Lamisa, we have an eng review tomorrow for the analytics LS platform. I didnt FW to you since it's the team taking lance through eng details." In the same exchange, Bice announced that platform work would be "moving to Neil" and told Dr. Parkar: "You need to trust me." On that same date, Bice began signaling his intent to place Sowmya Ballakur in a supervisory role over Dr. Parkar.

6

22.    During the week of April 21, 2025, Bice transferred Life Sciences analytics from Dr. Parkar to Neil Abraham during a Zoom call attended by Abraham, Ballakur, and others. No advance notice was provided to Dr. Parkar, and no business justification was offered for the transfer of responsibilities formally assigned to her fewer than two months earlier.

23.    Following the analytics transfer, Dr. Parkar's authority became unclear to her own colleagues. On May 28, 2025, Charles Curran, a colleague who had worked with Dr. Parkar on clinical trials matters, messaged her directly: "Do you report to Sowmya now? Im very confused about who owns what, including myself."

24.    On May 13, 2025, Bice directed Dr. Parkar and the product management team to jointly lead several strategic initiatives, assigning framing and planning work to Dr. Parkar alongside Graham Bury and others. The following day, Dr. Parkar wrote directly to Bice: "At this point, I am honestly questioning what my role is. I feel like you hold me accountable for everything though I don't own it all. Even things that I own, I start them off, just to have that be handed over to somebody else."

25.    Throughout the period from February through May 2025, Bice directed Oracle employees not to work with Dr. Parkar and to coordinate instead with other team members on matters within Dr. Parkar's stated responsibilities. This conduct occurred repeatedly, across multiple functions and with multiple different employees.

7

26.     The substantive work removed from Dr. Parkar's portfolio which included clinical trials strategy, analytics, pricing, product strategy, and go-to-market planning,  was transferred predominantly to male colleagues, specifically Graham Bury and Neil Abraham. Female team members, including Dr. Parkar, were expected to perform the underlying work that supported those male colleagues' success, without the accompanying authority or recognition.

27.     On May 16, 2025, Bice formally designated Sowmya Ballakur as the primary owner for Life Sciences Pharma/CRO activities, effectively placing a peer-level colleague over Dr. Parkar's remaining responsibilities. Dr. Parkar described the May 16 meeting as "antagonistic" and characterized Bice's conduct as "very retaliatory and hostile."

28.     By May 2025, Dr. Parkar's responsibilities had been reduced to functions that did not require an executive-level employee consisting of work that could be performed at a senior manager level, far below the role Oracle had recruited her to perform.

**D. Dr. Parkar's HR Complaint and Oracle's Retaliation**

29.      On May 15, 2025, Dr. Parkar met privately with Bice and requested inclusion in Oracle's upcoming reduction in force. Bice refused, telling Dr. Parkar that he would not include her in the RIF and that she would need to "walk out on my

8

own" — meaning resign voluntarily — an outcome that, under the clawback provision of her offer letter, would have required her to return her sign-on bonus.

30.    On May 17, 2025, Dr. Parkar sent a written request to Suzanne Castillo, Oracle's Principal HR Business Partner, requesting formal inclusion in the upcoming RIF. Dr. Parkar stated that her responsibilities "have been transitioned from me to other PM leaders in the org" and that the remaining scope no longer required a manager at her level. She described the May 16 meeting as antagonistic, stated that it "felt very retaliatory and hostile," reported that the situation was "affecting my mental health," and requested inclusion in the RIF "in a responsible, constructive, and mutually beneficial way."

31.    On May 27, 2025, Dr. Parkar formally reported her concerns regarding gender bias to Oracle's Human Resources department, stating that she felt her manager had a bias against women and did not like women willing to stand up to him. This formal complaint constituted protected activity under Title VII of the Civil Rights Act of 1964.

32.    On May 29, 2025, Dr. Parkar sent a follow-up email to Oracle Human Resources regarding the status of her RIF request, writing: "This is a systematic destruction of my career at Oracle. I genuinely can't believe this is happening and there are no checks and balances here."

33.    Three days after Dr. Parkar submitted her formal gender bias complaint, Bice excluded her from a key strategic offsite meeting in Seattle, Washington. The meeting involved high-level planning for Oracle's Life Sciences business and was attended by Sowmya Ballakur, Neil Abraham, and Graham Bury who were the three colleagues who had collectively assumed the Life Sciences strategy and product responsibilities previously held by Dr. Parkar. When Dr. Parkar inquired about the meeting, Bice characterized it as an engineering review and represented that other product management leaders would not be attending. That representation was false.

34.    Three days elapsed between Dr. Parkar's formal sex discrimination complaint on May 27, 2025 and Bice's exclusion of her from the Seattle meeting on May 30, 2025.

### E. Dr. Parkar's Constructive Discharge

35.    On June 30, 2025, Dr. Parkar's employment with Oracle ended when she was formally included in Oracle's reduction in force. Her departure was not a voluntary resignation; it was the product of intolerable conditions that Bice created and Oracle declined to remedy.

36.    By the time of her departure, Dr. Parkar had no meaningful strategic responsibilities. The substantive work she had been recruited to lead, including Life Sciences product strategy, clinical trials, real world evidence, analytics, and go-to-market planning, had been transferred to male colleagues. Bice had directed her

10

colleagues not to work with her even on the functions she nominally retained. He had refused to include her in the RIF even as her role had been hollowed out and told her she would need to resign voluntarily. The formal HR complaint she filed on May 27 had produced no relief. She had reported in writing that the conditions were affecting her mental health.

37.     The conditions described above were objectively intolerable. A reasonable person in Dr. Parkar's position, namely a senior executive who accepted her role based on explicit promises of strategic leadership, forfeited equity at a prior employer, and was subjected to a deliberate, months-long campaign to strip her of all meaningful function, would have felt compelled to leave.

38.     As a direct and proximate result of her constructive discharge, Dr. Parkar forfeited seventy-five percent of her RSU award, which had not vested at the time her employment ended. She received only the first twenty-five percent tranche, which vested in June 2025. Those RSUs had been awarded as part of the compensation package that induced Dr. Parkar to join Oracle and to leave equity behind at Mirati Therapeutics. She also suffered lost wages, bonuses, and benefits she would have continued to earn absent Oracle's unlawful conduct.

11

**F. A Pattern of Discriminatory Conduct Against Women in Bice's Organization**

39.    Dr. Parkar was not the first female executive in Nino Bice's organization to experience systematic stripping of job responsibilities, isolation from colleagues, and elimination of her role.

40.    Before recruiting Dr. Parkar to his team, Bice had employed previous women in comparable senior leadership roles. They experienced the same pattern: systematic reduction of their responsibilities, isolation from their teams and peers, and conditions sufficiently hostile that they departed without notice. Before leaving, they reported their concerns about Bice's conduct to Oracle's Human Resources department.

41.    The substantially identical treatment of other women and Dr. Parkar by the same supervisor demonstrates that Bice's conduct was not an isolated episode of poor management. It was a repeated, consistent pattern targeting women who questioned or challenged his authority.

12

## COUNT I

## SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

## (42 U.S.C. § 2000e et seq.)

42.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

43.    At all times relevant to this action, Dr. Parkar was female and a member of a class protected by Title VII of the Civil Rights Act of 1964.

44.    Dr. Parkar was qualified for the position of Group Vice President, Strategy and Research Services. Oracle's own executive leadership recruited her for that role based on her credentials and expertise, and she performed her responsibilities without documented performance deficiency.

45.    Dr. Parkar suffered multiple, continuing adverse employment actions on account of her sex, including:

> a.   the systematic removal of her core job responsibilities and their transfer predominantly to male colleagues;
>
> b.   active interference with her ability to perform the functions she retained, including Bice's directions to colleagues to bypass her on matters she owned;

13

c.  the effective reduction of her role from an executive leadership position to functions below the level for which Oracle had hired her;

d.  he appointment of a peer-level colleague as a supervisory layer over her remaining responsibilities, without prior notice to Dr. Parkar;

e.  exclusion from engineering and strategic planning meetings she was entitled to attend; and

f.  constructive discharge from employment.

46.     Similarly situated male employees received, rather than lost, substantive responsibilities during the same period. Graham Bury and Neil Abraham both received strategic and product functions previously assigned to Dr. Parkar, without legitimate business justification for those transfers. Upon information and belief, following Dr. Parkar's departure, Oracle hired a male executive at the Senior Vice President level, a title above Dr. Parkar's Group Vice President designation, to perform functions substantially similar to those Dr. Parkar had been hired to perform.

47.     The pattern of allocation within Bice's organization during the relevant period further supports the inference that sex was a motivating factor in the adverse treatment Dr. Parkar experienced: substantive strategic and product responsibilities were transferred to male colleagues, while female team members were expected to

perform the work that supported those colleagues' success, without the accompanying authority or recognition.

48.   Oracle, acting through Bice as Dr. Parkar's direct supervisor, is liable for the discriminatory adverse employment actions described herein. Bice exercised actual authority over the scope of Dr. Parkar's responsibilities, her access to colleagues and meetings, and the organizational conditions that rendered her continued employment untenable.

49.   Oracle is independently liable for the conduct described herein because it knew or should have known of Bice's prior treatment of other women in comparable roles, including their HR complaints and immediate departures, and took no meaningful action to address that pattern before Bice subjected Dr. Parkar to the same conduct.

50.    Plaintiff's sex was a motivating factor in the adverse employment actions Oracle took against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

51.   As a direct and proximate result of Oracle's unlawful discrimination, Dr. Parkar has suffered and continues to suffer: back pay and lost wages; forfeiture of unvested RSU compensation valued at approximately $1.2 million at grant value; lost future compensation; emotional distress; harm to professional reputation and career; and other compensatory and pecuniary losses.

52.     Oracle's conduct was carried out with malice or with reckless indifference to Dr. Parkar's federally protected rights, entitling her to an award of punitive damages to the extent permitted by Title VII.

## COUNT II

## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (42 U.S.C. § 2000e et seq.)

53.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

54.     On May 27, 2025, Dr. Parkar engaged in activity protected by Title VII when she formally reported to Oracle's Human Resources department her good-faith belief that Nino Bice was discriminating against her on the basis of sex.

55.      Following that protected activity, Bice excluded Dr. Parkar from a strategic offsite meeting in Seattle, Washington on May 30, 2025, three days after she filed her formal HR complaint. The meeting was attended by Sowmya Ballakur, Neil Abraham, and Graham Bury, the three product management colleagues who had collectively assumed the Life Sciences strategy and product responsibilities previously held by Dr. Parkar. Bice misrepresented to Dr. Parkar that the meeting was

an engineering review that other product management leaders would not be attending. That representation was false.

56.    The three-day interval between Dr. Parkar's protected activity on May 27, 2025 and Bice's exclusion of her from the Seattle meeting on May 30, 2025 establishes the causal connection between her complaint and the adverse action.

57.    The exclusion was materially adverse. It deprived Dr. Parkar of participation in strategic planning for the business unit she nominally retained, further demonstrated to Oracle's organization that her complaint had worsened rather than improved her position, and contributed to the ongoing deterioration of the conditions of her employment.

58.    Oracle's stated justification for the exclusion, that the meeting was an engineering review, was pretextual. The attendance of Ballakur, Abraham, and Bury, each a product management leader, confirms that the meeting was not limited to engineering staff.

59.    Dr. Parkar's May 27, 2025 complaint of sex discrimination was a motivating factor in Oracle's decision to exclude her from the May 30, 2025 Seattle meeting.

60.    As a direct and proximate result of Oracle's unlawful retaliation, Dr. Parkar has suffered and continues to suffer: emotional distress; harm to professional

17

reputation and career prospects; diminished standing within Oracle's organization; and deterioration of the conditions that contributed to her constructive discharge.

61.    Oracle's retaliatory conduct was carried out with malice or with reckless indifference to Dr. Parkar's federally protected rights, entitling her to an award of punitive damages to the extent permitted by Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Lamisa Parkar respectfully requests that this Court enter judgment in her favor and against Defendant Oracle America, Inc. and award the following relief:

(a) Back pay representing wages, salary, bonuses, and benefits lost from June 30, 2025 through the date of judgment, offset by amounts earned through mitigation;

(b) Front pay, or reinstatement to a position equivalent to the role Dr. Parkar was recruited to perform, if reinstatement is deemed feasible and appropriate;

(c) Compensatory damages for all economic losses resulting from Oracle's unlawful conduct, including the forfeited unvested RSUs valued at approximately $1.2 million at the original grant value, with the applicable market valuation to be determined at trial;

(d) Compensatory damages for emotional distress, mental anguish, harm to professional reputation, and damage to career trajectory, in amounts to be determined at trial;

(e) Punitive damages to the maximum extent permitted by Title VII of the Civil Rights Act of 1964;

(f) Reasonable attorneys' fees and costs pursuant to Title VII; and

(g) Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Benjamin F. Barrett
Benjamin F. Barrett
GA Bar Number 039586
Ben Barrett Law
3379 Peachtree Road, Suite 655
Atlanta, Georgia 30326
ben@benbarrettlaw.com

Attorney for Plaintiff Dr. Lamisa Parkar

19